Lita Beth Wright, Esq.
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
*Attorneys for Plaintiff Angela Krivulka,*
*individually and as Co-Executor*
*of the Estate of Joseph Krivulka*

### UNITED STATES DISTRIC COURT
### DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| ANGELA KRIVULKA, individually and as Co-Executor of the ESTATE OF JOSEPH KRIVULKA, | |
| Plaintiff, | Civil Action No.: |
| v. | **COMPLAINT** |
| MICHAEL LERNER and LOWENSTEIN SANDLER LLP, | (With Jury Demand) |
| Defendants. | |

---

Plaintiff ANGELA KRIVULKA, individually and as Co-Executor of the Estate of Joseph

Krivulka, as and for her complaint against MICHAEL LERNER ("Lerner") and LOWENSTEIN

SANDLER LLP ("Lowenstein") alleges as follows:

### INTRODUCTION

1.     The late Joseph Krivulka successfully invested in a range of pharmaceutical

businesses, which acquired, developed, sold and marketed pharmaceutical products in the areas

of cardiovascular medicine, endocrinology and pain management (the "Krivulka Entities").  The

Krivulka Entities targeted the acquisition and commercialization of under-promoted, under-

utilized pharmaceutical products and those in late stage clinical development.

2.      Lerner and Lowenstein served as counsel to the Krivulka Entities over the years those Entities prospered. During this time frame, Lerner also became a business partner in several of the Krivulka Entities.  Lerner and Lowenstein also became personal counsel to Mr. and Mrs. Krivulka (collectively, the "Krivulkas"), and Lowenstein provided estate planning services to both of them.

3.      Despite the inherent conflicts of interest, the estate instruments and trusts that Lowenstein prepared for the Krivulkas vested substantial power in, and have provided millions of dollars, to Lerner because of the positions granted to him and the statutory commissions afforded under New Jersey law in connection with those positions.  Lowenstein also stood to gain millions in legal fees through its representation of Lerner in connection with the administration of Mr. Krivulka's Estate.  Taking legal fees, executor commissions and sales of certain Krivulka Entities' products and assets into account since Mr. Krivulka's death, in just the first two years of the Estate's administration, Lowenstein and Lerner have pocketed nearly $7,000,000 combined.

4.      Unchecked by the strict ethical proscriptions of his profession, Lerner leveraged his and his firm's positions as trusted fiduciaries and long-standing counsel to the Krivulkas and the Krivulka Entities to achieve his ultimate goal of wielding control over the substantial wealth that Mr. and Mrs. Krivulka spent years building.  To get there, Lerner assumed a multitude of roles that have had him and his firm wearing multiple hats with conflicting interests.  To name several:

(i)      Lerner and Lowenstein served as the Krivulkas' personal counsel for various matters, including estate planning;

(ii)     Lerner, in estate planning instruments drafted by Lowenstein and as Mr. Krivulka's "attorney and friend," was named co-executor of Mr. Krivulka's Will and trustee of various trusts with beneficiaries having competing or conflicting interests;

2

(iii)    Lerner, as Mrs. Krivulka's "attorney and friend," was named as a successor executor, trustee, attorney-in-fact or health care proxy in her Will, Durable Power of Attorney, trusts and health care advance directives, all drafted by Lowenstein;

(iv)    Lerner and Lowenstein served as counsel to the Krivulka Entities, even after Lerner became a co-executor of the Estate;

(v)    Lerner through JAM Investment Partners, LLC ("JAM"), was and still is a partner with the Krivulkas in certain of the Krivulka Entities;

(vi)    Lerner and Lowenstein served as lead deal counsel in the monetization of valuable pharmaceutical assets for the Krivulka Entities in which Lerner has ownership interests through JAM, both before and after Lerner became co-executor; and

(vii)    Lerner was and still is a partner in Lowenstein which, in turn, has continuously served as the Krivulkas' personal and their businesses' counsel, including entities in which Lerner had a direct or indirect ownership interest.

5.    Without making required disclosures about potential or actual conflicts arising from representing both spouses concerning their respective estate plans, or obtaining informed consents, or alerting Mrs. Krivulka to new conflicts as they arose, Lowenstein's estate planning group prepared the Krivulkas' estate plans and instruments, which vested Lerner with effective control over the bulk of the Krivulkas' assets. As discussed below, a very substantial portion of these assets were properly the subject of Arizona's community property laws, which if applied correctly would have significantly limited the amount of assets treated as going into the Estate and the various trusts where Lerner had and continues to have control positions.

6.    Under Mr. Krivulka's estate planning documents, drafted by Lowenstein, Lerner was:

(i)    designated co-executor of his Estate, with Mrs. Krivulka also named a co-executor;

(ii)    exculpated from liability to any beneficiary as long as he acted in good faith and without willful misconduct or fraud;

(iii)    given the unconditional right to name a third co-executor allowing him to outvote Mrs. Krivulka should he deem it desirable—a threat he asserted just months after Mr. Krivulka's death, and again recently;

(iv)    designated as Watchman under various instruments, which allows Lerner to exercise certain powers in a purportedly nonfiduciary capacity;[1]

(v)    designated co-trustee of a marital trust of which Mrs. Krivulka is the primary beneficiary;

(vi)    designated trustee of the JJK 2016 Trust and subtrusts thereunder, which benefit the Krivulkas' respective children and which are the remainder beneficiaries of the marital trust; and

(vii)    trustee of various trusts benefitting Mr. Krivulka's children, including an insurance trust that was to be funded by $25,000,000 in life insurance; and

(viii)    trustee or co-trustee of various trusts benefitting Mrs. Krivulka's children.

7.     By the time of Mr. Krivulka's death in 2018, Lerner and Lowenstein had known for years both that the Krivulkas had moved permanently to Arizona no later than 2009, and that a substantial part of their wealth was accumulated after 2009.  As explained below, a substantial part of the assets treated by Lerner and Lowenstein as part of the Estate belong to Mrs. Krivulka as her 50% share of the community property. As such, this is simply not Estate property and should not be included in the Estate nor subject to administration by the co-executors of the Estate, because the Krivulkas had been permanent Arizona residents and domiciliaries since no later than 2009.

8.     Lerner and Lowenstein were well aware of this fact through their ongoing representation of the Krivulkas and the Krivulka Entities, and as they provided estate planning advice to Mr. Krivulka just five or six months before he was diagnosed with what turned out to

---

[1] Notwithstanding the fact that the powers of the Watchman are to be exercised in a nonfiduciary capacity, if it is determined that such powers are to be exercised in a fiduciary capacity, then "the Watchman shall be entitled to commissions for service as Watchman computed in the same manner as commissions for service as trustee in accordance with New Jersey statutes, without reduction and in addition to any commissions to which the same individual may be entitled for service as a trustee."

be a terminal illness. Nevertheless, Lerner and Lowenstein never advised Mrs. Krivulka, their client, of that fact or even suggested it.

9.      The morning after Mr. Krivulka's death, Lerner took advantage of Mrs. Krivulka's vulnerable, grieving state by instructing her to take steps that, unbeknownst to her, made it more feasible for Lowenstein and Lerner to initiate probate proceedings in New Jersey, which they did in March 2018.  In fact, as explained below, Lerner and Lowenstein took affirmative steps to probate Mr. Krivulka's Will in New Jersey even before the firm was hired to serve as counsel for the co-executors, all without Mrs. Krivulka's knowledge or informed consent.

10.      Lowenstein's failure to properly take into account Mrs. Krivulka's community property interest resulted in Mr. Krivulka's estate being overstated by three times its actual value. Taking her community property interests into account would also have eliminated Lerner's ability to control a sizeable amount of assets that were instead improperly treated as part of the Estate, and would have reduced substantially the commissions earned, and to be earned, by him as co-executor and trustee of the various trusts.

11.      Lowenstein, which has no office in Arizona nor lawyers licensed to practice there, would not have been able to handle the administration of the Estate as counsel to either of the Estate's co-executors if probate proceedings had been commenced there as they should have been and would have lost the opportunity to collect more than $2,500,000 in fees in the first two years of the Estate's administration.

12.      At the time Lowenstein solicited Mrs. Krivulka to engage the law firm to serve as her counsel as co-executor, the firm knew or should have known the blatant conflicts it and Lerner had including:

5

(i)     Lerner's role as co-executor;

(ii)    Lowenstein's representation of Lerner in his role as co-executor;

(iii)   Lowenstein's representation of Mrs. Krivulka in her role as co-executor;

(iv)    Lerner's role as trustee of various trusts that have beneficiaries, including Mrs. Krivulka, with conflicting interests explained below;

(v)     Lowenstein's representation of Lerner in his role as trustee of some of the trusts;

(vi)    Lowenstein's representation of Mr. and Mrs. Krivulka in connection with their respective estate plans (including the fact that Lowenstein never terminated its representation of Mrs. Krivulka in connection with her estate planning);

(vii)   Lerner's ownership in entities that were partners in some of the Krivulka Entities; and

(viii)  Lowenstein's representation of many of the Krivulka Entities, including those in which Lerner's entities owned interests.

Neither Lowenstein nor Lerner disclosed these conflicts or their significance to Mrs. Krivulka, much less in writing, as required by law. Nor did they advise her to consult independent counsel. To the contrary, when Lowenstein and Lerner solicited Mrs. Krivulka to hire the firm to advise her as co-executor, they told her that they were unaware of any facts that would prevent the firm from representing her even though the firm and Lerner were well aware of these conflicts, among others.

13.     Accordingly, Mrs. Krivulka, individually and as co-executor of the Estate of the Joseph Krivulka (the "Estate"), seeks to recover damages for Lowenstein's and Lerner's negligent and reckless acts, omissions and blatant conflicts of interest and breaches of their fiduciary obligations to her and her late husband.

## THE PARTIES

14.     Mrs. Krivulka is the widow of Mr. Krivulka and a co-executor of his Estate.

6

15.     The Krivulkas have been domiciled and resided in Arizona continuously since at least August 2009 through and including the date of Mr. Krivulka's death in February 2018. Mrs. Krivulka continues to be a domiciliary and resident of Scottsdale, Arizona.

16.     Lowenstein is a national law firm of over three hundred lawyers. Lowenstein maintains an office in New Jersey at One Lowenstein Drive, Roseland, New Jersey 07068, but does not maintain an office in Arizona.  None of Lowenstein's partners are licensed to practice in Arizona, and upon information and belief, its partners are variously citizens of some or all of California, Connecticut, the District of Columbia, Maryland, New Jersey, New York, Utah and/or Virginia, but not Arizona.

17.     Lerner is an attorney licensed to practice law in and citizen of the State of New Jersey.  He is a co-executor of the Estate and a partner in Lowenstein practicing out of the firm's New Jersey office.  Lerner is the Chair of Lowenstein's Life Sciences Group, and owns interests (either directly or indirectly) in at least four of the Krivulka Entities.  Lerner is sued herein solely as an individual and not as a representative of the Estate, against which plaintiff seeks no relief in this action.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

**The Krivulkas**

20.    Mr. and Mrs. Krivulka were married on March 26, 2005.

21.    Mrs. Krivulka has two sons from a previous marriage, Alex Engelken and Derek Engelken.

22.    Mr. Krivulka had three children from a prior relationship and marriage.

23.    At the time of their marriage, the Krivulkas were New Jersey citizens. In 2006, they moved into a home in Holmdel, New Jersey that was titled in Mrs. Krivulka's name only.

24.    In March 2008, the Krivulkas purchased their first home in Arizona, and took title as community property with rights of survivorship with the intention of making it their permanent home and domicile.

25.    In April 2008, Mr. Krivulka opened bank accounts at JP Morgan Chase's Carefree, Arizona branch.  Mr. Krivulka also established investment accounts with Morgan Stanley in Scottsdale, Arizona which were managed by Private Wealth Advisors in the Scottsdale branch.

26.    After the Krivulkas changed their residence and domicile to Arizona, they also registered the majority of their motor vehicles in Arizona.

27.    The Krivulkas purchased and moved into their second Arizona residence in 2011, continuing to make Arizona their permanent home and domicile.

28.    As with their first Arizona residence, the Krivulkas took title to their second Arizona residence as community property with rights of survivorship.

29.    And, in 2015 when they purchased an airplane, it was registered and hangered in Arizona.

8

30.     The Krivulkas maintained their permanent home and domicile together in Arizona until Mr. Krivulka's death on February 17, 2018.

31.     Mrs. Krivulka continues to live full-time in Arizona.

**The Krivulkas and Lerner**

32.     Mr. Krivulka was a successful pharmaceutical investor and executive.

33.     Lerner's and Mr. Krivulka's professional relationship dates back two decades to when Mr. Krivulka was Chief Executive Officer of Reliant Pharmaceuticals and Lerner was Reliant's general counsel.

34.     When Lerner joined Lowenstein, Lerner and Lowenstein became regular outside counsel to Mr. Krivulka's pharmaceutical businesses.

35.     Lerner and Lowenstein represented a number of Krivulka owned and controlled businesses in the acquisition, sale and licensing of pharmaceutical products and other assets.

36.     Lowenstein also drafted the operating agreements and other corporate governance documents for most, if not all, of the Krivulka Entities. Lerner was intimately involved in the creation and details of the Krivulka Entities.

37.     Lerner and Lowenstein also served as counsel through the years for other businesses owned and controlled by Mr. and/or Mrs. Krivulka, and served generally as their personal counsel.

38.     Beginning in or about 2009, Lerner, through JAM Investment Partners, LLC, became a business partner in certain Krivulka Entities.  Lerner eventually acquired and still holds indirect ownership interests in at least four Krivulka Entities.

**Lowenstein Acts as the Krivulkas' Personal Counsel, Including Providing Estate Planning
Services**

39.     Lowenstein has served as personal counsel for the Krivulkas, in addition to
counseling businesses owned and controlled by them, since at least 2009.

40.     Lowenstein served as counsel for both Mr. and Mrs. Krivulka with respect to
estate planning since at least 2009 when Lowenstein drafted their Wills, revocable trust
agreements and financial and health care directive documents.

41.     When Lowenstein prepared the Krivulkas' estate planning documents, which
were executed in August 2009, the Krivulkas' were domiciled in Arizona—a community
property state—and Lowenstein knew it.

42.     With respect to Mrs. Krivulka's estate plan, Lowenstein prepared her Will, the
ALK Revocable Trust, the ALK 2009 Trust (an insurance trust), a Durable Power of Attorney
and an Advance Directive for Health Care.  Despite then being domiciled in Arizona,
Lowenstein improperly drafted Mrs. Krivulka's Will, like Mr. Krivulka's Will, to account for
New Jersey's elective share statute rather than Arizona community property law.

43.     In each of Mrs. Krivulka's 2009 estate planning instruments, Lerner, as her
"attorney and friend," is named as a successor executor, trustee, attorney-in-fact or health care
proxy to Mr. Krivulka (who was named her primary representative in each instrument), or her
eldest son Alex.

44.     In his Will, which was also executed in August 2009 while the Krivulkas were
Arizona residents and domiciliaries, Mr. Krivulka named Mrs. Krivulka and Lerner co-executors
of his Estate.  Under a revocable trust agreement executed at the same time as the Will, Mrs.
Krivulka and Lerner were named co-trustees of the marital trust, which the bulk of his Estate is
to fund for her benefit during her lifetime.

45.     On Mrs. Krivulka's death, the residue of the marital trust will pass to trusts under the JJK 2016 Trust, which benefit the Krivulkas' respective children in different percentages. Lerner is the trustee of those trusts.

46.     In the Krivulkas' estate planning instruments, with Lerner named as co-executor and trustee (or successor executor or trustee), Lowenstein included limitations on Lerner's liability to any beneficiary "as long as [he] has acted in good faith and without willful misconduct or fraud.  Except for fraud or willful misconduct undertaken in bad faith, [the Krivulkas] exculpate [their] executor from all liability to any beneficiary."

47.     In addition to estate planning, Lerner and Lowenstein also represented Mrs. Krivulka and her family in a variety of matters, including the acquisition of a spa/salon business, legal matters spawning from that acquisition and a matter concerning one of her son's college residences.

**Krivulka Family, LLC**

48.      On or about January 31, 2011, well after the Krivulkas made their permanent move to Arizona, Mr. Krivulka formed Krivulka Family, LLC ("Krivulka Family"), a Delaware limited liability company.  He was the sole member and manager of Krivulka Family, which, among other things, held interests in certain of the Krivulka Entities.  Lowenstein, under Lerner's direction, prepared the original Limited Liability Company Agreement of Krivulka Family.

49.     On or about January 1, 2015, Mr. Krivulka transferred 49% of his interest in Krivulka Family to Mrs. Krivulka and three trusts benefitting each of his children.  Lowenstein, under Lerner's direction, prepared the Amended and Restated Limited Liability Company

Agreement of Krivulka Family (the "Amended and Restated LLC Agreement") that reflected this transfer.

50.     According to the Amended and Restated LLC Agreement, since 2015, the members of Krivulka Family have been: Mr. Krivulka (now the Estate), holding a 51% profit percentage and 100% of the LLC's voting units; Mrs. Krivulka, holding a 9% profit percentage; and three trusts benefitting each of Mr. Krivulka's three children (the EK GST Trust, holding a 10% profits interest, the HK GST Trust, holding a 15% profits interest, and the PK GST Trust, holding a 15% profits interest (collectively, the "GST Trusts")).  Lerner is the trustee of the GST Trusts.

51.     Mr. Krivulka remained Krivulka Family's manager until his death. As discussed below, that was because Lerner failed to follow Mr. Krivulka's explicit instructions in December 2017 to prepare the necessary consents for him to sign appointing Mrs. Krivulka manager of Krivulka Family in his stead.

52.     By the time Mr. Krivulka formed Krivulka Family in 2011, the Krivulkas were permanent residents and domiciliaries of Arizona, rendering his interest in Krivulka Family community property.  Thus, Mrs. Krivulka held a one-half community property interest in Krivulka Family from inception.

53.     Also, under Arizona community property law, as stated in the Memorandum (defined below), Mr. Krivulka had only the authority to gift his one-half interest in the community property.  So, when Mr. Krivulka gifted a 49% interest to the Krivulka Family members set forth in the Amended and Restated LLC Agreement for Krivulka Family in 2015, such gift was made from his 50% share, thus resulting in him retaining only a 1% interest, with Mrs. Krivulka holding a 59% interest (representing her original 50% community property

interest plus the 9% interest gifted to her by Mr. Krivulka from his original 50% community

property share and the three GST Trusts benefiting Mr. Krivulka's children holding 40%).

**Lowenstein Meets with Mr. Krivulka to Discuss His Estate Plan Without Mrs. Krivulka**

54.    In or about February or March 2016, Lowenstein partner John Berger ("Berger")

met with Mr. Krivulka and Tim Soule, an employee of one of Mr. Krivulka's companies, to

discuss Mr. Krivulka's estate plan.

55.    On March 8, 2016, Berger memorialized the discussion with Mr. Krivulka and

Soule in a Memorandum the subject of which was "Estate Planning Summary" (the

"Memorandum").  Although Mrs. Krivulka was neither invited to the meeting nor advised that it

was happening, the Memorandum was addressed to both Mr. *and Mrs. Krivulka*, both of whom

were of course ongoing clients of Lowenstein for estate planning and other matters.

56.    According to the Memorandum, the topics discussed included changing domicile

to Arizona (even though, by that point in time, the Krivulkas had already made Arizona their

permanent home at least seven years earlier and Lowenstein knew that fact), updating Mr.

Krivulka's estate planning documents, changing the bequests to the Krivulkas' respective

children by modifying the percentages of the residue of the marital trust passing to each of them,

changing Mr. Krivulka's Advance Directive for Health Care, and updating his power of attorney.

57.    With respect to Mrs. Krivulka, Lowenstein suggested that her estate planning

documents should similarly be updated, including her power of attorney, and if desired, her

Advance Directive for Health Care.

58.    Although it was addressed to both Mr. and Mrs. Krivulka, Lowenstein emailed

the Memorandum to Mr. Krivulka only, and did not send it to Mrs. Krivulka directly.

59.    In fact, the Memorandum itself is even more significant for what Lowenstein fails to say than what it does say.  In the introduction, Lowenstein noted that:

> I've summarized below the major issues discussed at that meeting.  As we discussed at the meeting, I also reviewed the tax laws in Arizona as it relates to both taxes and estate taxes, and that information is also summarized below.  *Of particular importance, I learned that Arizona is a so-called "community property" state; that fact could have significant bearing on your planning and merits further discussion.*

(*emphasis added*).

60.    The Memorandum further indicated that "Joe mentioned your Arizona residence is owned as joint tenants.  As such, it will pass outright to the surviving spouse, thus eliminating the need to have a residence trust for the surviving spouse's benefit."  As noted above, the Krivulkas' Arizona home was owned by both of them as community property with a right of survivorship. Had Lowenstein examined this issue with the requisite level of due care, the firm would have discovered that the Krivulkas held their Scottsdale home as community property with a right of survivorship.  Lowenstein knew from the amount of time they spent in Arizona that the Krivulkas had moved there years earlier. They held bank accounts in Arizona, registered automobiles and the airplane in Arizona, and Mr. Krivulka owned no real property in New Jersey by that point in time.

61.    According to the Memorandum, Mr. Krivulka, Berger and Soule "discussed the possibility that you might move from New Jersey to Arizona.  Joe asked me to explore the tax consequences of such a move."  The Memorandum noted that Arizona's top income bracket was approximately half of New Jersey's, and Arizona, unlike New Jersey, did not have an estate tax.[2] "Thus, from a tax standpoint, Arizona clearly is a more advantageous state in which to be domiciled."

---

[2] By February 2018, when Mr. Krivulka died, New Jersey had eliminated the estate tax.

62.    Lowenstein went on to note that:

> One potentially complicating factor is that Arizona is a so-called "community property" state. As a general rule, community property jurisdictions treat property acquired during the marriage as being owned one-half by each spouse. This has both estate planning implications (each spouse could give away their half of the property) and non-estate planning implications (both re: control of the property during marriage and division of the property if you were to divorce). It means your current estate plan, which is designed to account for New Jersey's elective share statute, likely would need to be substantially modified. I suggest we set up a call to discuss this issue further. Once we speak, I can send you the "change of domicile" memo we discussed, if appropriate.

63.    Despite this, Lowenstein never investigated or confirmed how the title of the Krivulkas' Arizona residence was actually held -- community property with right of survivorship.  Nor did Lowenstein address the fact that the Krivulkas had already made Arizona their permanent home at least seven years earlier. Certainly their client Mrs. Krivulka had.

64.    Thus, the Memorandum's characterization of the inquiry as "discuss[ing] the possibility you might move from New Jersey to Arizona" when Lowenstein was fully aware that the Krivulkas had already moved permanently to Arizona was, at the very least, disingenuous.  It reflects one of several possibilities, including: (i) an unjustified failure on Lowenstein's part to investigate or take into account the critical facts with reasonable care that were relevant to the advice Mr. Krivulka sought and Lowenstein gave; (ii) an unjustified failure to ask basic, relevant questions with reasonable care; (iii) a willingness to turn a blind eye to known, dispositive facts; (iv) a deliberate decision by Lerner and Lowenstein to promote their own interests ahead of the Krivulkas' interests (and to the direct detriment to the Krivulkas' interests by exposing them to New Jersey's higher income tax rates and otherwise); or (v) all of the above.

65.    In fact, Lerner, having served regularly as counsel to the Krivulkas and the Krivulka Entities throughout this period, was well-aware that the Krivulkas had, in fact, made

15

Arizona their permanent residence and domicile since at least 2009, and that Mr. Krivulka

opened offices for his key business operations in Scottsdale, Arizona in or about March 2015.

Lerner also knew that key employees of the Krivulka Entities started moving to Arizona after the

Scottsdale office opened in 2015.

66.     In November 2016, while Mr. Krivulka was undergoing treatment in Arizona,

Lowenstein prepared the JJK 2016 Trust, a First Amendment to Trust Agreement, and a First

Codicil to his Will, each dated and signed by Mr. Krivulka on November 29, 2016.  These

instruments instituted certain changes discussed in the March 8 Memorandum.

67.     Lowenstein never disclosed to Mrs. Krivulka that these changes were made to Mr.

Krivulka's estate planning instruments per the Memorandum that was also addressed to her in

March 2016, but never sent to her.

68.     To Mrs. Krivulka's knowledge, Lowenstein took no steps to change either Mr. or

Mrs. Krivulka's estate planning documents to reflect the reality that the Krivulkas had made

Arizona, a community property state, their primary, permanent residence and domicile many

years earlier.

69.     Lowenstein never discussed the Memorandum with Mrs. Krivulka even though it

was addressed to her and raised significant issues that affected her, such as "Changing Domicile"

and the estate planning and non-estate planning implications of having lived in a community

property state for at least seven years prior to that meeting.  Nor did Lowenstein send, or even

offer to send, to Mrs. Krivulka the "change of domicile" memo that they offered to send to Mr.

Krivulka as referenced in ¶ 62, *supra*. Those issues impacted her estate plan just as significantly

as Lowenstein indicated it would impact Mr. Krivulka's.

70.     Lowenstein also failed to advise Mrs. Krivulka of the favorable tax and community property treatment resulting from her and Mr. Krivulka's permanent move to Arizona, or the unfavorable tax and estate planning consequences of supposedly maintaining New Jersey as a domicile.  Nor did Lowenstein raise with her, either in 2016 or later, the relative positives or negatives of probating an estate in Arizona versus New Jersey.  And no one from Lowenstein ever recommended that Mrs. Krivulka consult with separate counsel concerning any of these issues.

71.     This was so Lowenstein and Lerner could continue to advise Mr. Krivulka, and ensure that Lerner would serve as co-executor of a much larger estate and trustee of more sizable trusts.  It was, and still is, in Lerner's economic interest to maximize the size of the estate and corpus of the trusts for which he serves as trustee, ensuring a steady stream of significant income for not only Mrs. Krivulka's lifetime, but the Krivulka children's lifetimes as well.

72.     Under N.J.S.A. 3B:18-14, executors are entitled to a one-time commission on the corpus of the estate of (i) 5% on the first $200,000 of all corpus received by the executor; (ii) 3.5% on the excess over $200,000 up to $1,000,000; (iii) 2% on the excess over $1,000,000; and 1% of all corpus for each additional executor provided that no one executor shall be entitled to any greater commission than that which would be allowed if there were but one executor involved.  Additionally, under N.J.S.A. 3B:18-13, executors are entitled to receive an annual 6% commission on estate income.

73.     More importantly to Lerner, under N.J.S.A. 3B:18-25, trustees may receive an annual commission on the corpus of the trust equal to 0.5% of the first $400,000 and 0.3% on

any amounts exceeding $400,000. Additionally, the trustee is entitled to a 6% commission on all income earned on the corpus.[3]

74.    Arizona does not have similar statutory fees for co-executors—instead, the compensation to the executor must be reasonable pursuant to A.R.S. §14-10708.

75.    Lowenstein's failure to send the Memorandum directly to Mrs. Krivulka or to discuss its content with her are material omissions on Lowenstein's part and violated, among other things, Lowenstein's obligations to her concerning "Communications" under Rule 1.4 (b) and (c) of New Jersey's Rules of Professional Conduct. According to the American College of Trusts & Estates Counsel's commentary on Model Rule 1.4 (5th edition 2016):

> In order to obtain sufficient information and direction from a client, and to explain a matter to a client sufficiently for the client to make informed decisions, a lawyer should meet personally with the client at the outset of a representation. *A lawyer should not agree to do estate planning for one person when the lawyer's only communication has been with another who purports to be acting as an intermediary for the client.* If circumstances prevent a lawyer from meeting personally with the client, the lawyer should communicate as directly as possible with the client. In either case the elements of the engagement should be confirmed in an engagement letter.

Lowenstein's failure to follow that rule was compounded by the Memorandum's acknowledgment of potential conflicting interests that would arise under Arizona's community property laws. That conflict alone should have caused Lowenstein to ensure direct communication on the topic with Mrs. Krivulka, which they failed to do. And, in the absence of informed consent by both Krivulkas, of which there is no documentary record, Lowenstein's and

---

[3] Based on the assets identified in the estate tax return filed for Mr. Krivulka's estate that are to be allocated to trusts to be managed by Lerner as co-trustee or sole trustee, and assuming a fairly conservative rate of return on those assets, then Lerner stands to receive in the high six figures in trustee fees annually.

Lerner's ethical obligation at that point, and importantly continuously thereafter, was to advise Mrs. Krivulka that she should consult with her own counsel.

76.     Indeed, Lowenstein failed at all critical junctures to advise Mrs. Krivulka that she should or even could consult independent counsel, including: (i) in March 2016, when the Memorandum raised issues that put Mr. Krivulka's interests at odds with Mrs. Krivulka's; (ii) after Mr. Krivulka's illness while Mrs. Krivulka believed her "friend and attorney" Lerner and his firm, Lowenstein, were acting in her best interests where they had a self-interested pecuniary interest in how the Estate would be managed upon Mr. Krivulka's passing; and (iii) as discussed below, after Mr. Krivulka's death when Lowenstein and Lerner solicited her to hire the firm as her counsel as co-executor, all without making any of the disclosures required by New Jersey's Rules of Professional Conduct.  Lowenstein's and Lerner's failures and omissions in this regard only served to create, at great expense to Mrs. Krivulka and Mr. Krivulka's Estate, ever-increasing conflicts from which they have reaped millions of dollars in benefits.

77.     Had Lowenstein provided the Memorandum to Mrs. Krivulka and advised her to consult with independent counsel, she would have retained counsel in Arizona to advise her concerning the community property and other estate planning and tax issues raised in the Memorandum.

78.     Instead, as a result of Lerner's and Lowenstein's improper actions and omissions, from at least 2009 through 2017, the Krivulkas paid millions of dollars as New Jersey residents than they would have had they filed their returns as the Arizona residents and domiciliaries they were, and the bulk of Mr. Krivulka's Estate will be held in a marital trust with Lerner as co-trustee instead of a significant portion of it being owned and controlled outright by Mrs. Krivulka as her share of the community property.  Moreover, the inherent conflict created by such a

structure promises a steady stream of legal fees, trustee fees, co-executor fees, and other compensation to Lerner and Lowenstein by virtue of Lerner's positions of control.

**Mr. Krivulka's Illness, the JJK 2016 Insurance Trust and His Death**

### The JJK 2016 Life Insurance Trust and Lerner as Trustee

79.      According to the Estate Planning Summary, one of the topics discussed at the meeting with Soule, Berger and Joe was obtaining life insurance. The policies were to fund a trust that would benefit Mr. Krivulka's two youngest children (the "JJK 2016 Insurance Trust" or "Insurance Trust")). Lerner was charged with serving as the Insurance Trust's trustee, in which capacity he anticipated reaping additional commissions.

80.      On or about July 22 and August 5, 2016, Mr. Krivulka submitted an application for two life insurance policies to Symetra Life Insurance Company ("Symetra"), with a total value of $25,000,000 (the "Policies") that would fund the Insurance Trust after his death.

81.      On or about July 22, 2016, Lerner executed Trust Certifications seeking the issuance of the Policies.

### Mr. Krivulka's "Change in Condition"

82.      On or about August 9, 2016, Mr. Krivulka had a medical examination that revealed possible metastatic lung cancer.  The medical examination had been scheduled since late June 2016 but was not disclosed to Symetra in either the July 22 or August 5 applications.

83.      Also on August 9, 2016, knowing that he was scheduled for a medical examination the same day, the insurance broker procuring the policy for Mr. Krivulka sought and obtained a waiver of Symetra's requirement to submit a supplemental statement of medical condition prior to issuance of the Policies, again without disclosing the medical evaluation scheduled for the same day.

84.     By the end of August 2016, further testing confirmed a cancer diagnosis (although the correct cancer diagnosis was ultimately made later in September 2016.)

85.     On September 8, 2016, the insurance broker advised Mr. Krivulka by email, with a copy to Lerner (who was both trustee of the Insurance Trust and Mr. Krivulka's lawyer), that he believed that the waiver obtained on August 9 protected him from having to make any further health disclosures prior to the Policies issuing.

86.     On September 12, 2016, Mr. Soule, who had attended the March 2016 estate planning meeting with Berger and Mr. Krivulka, emailed Lerner, with a copy to Mr. Krivulka, as follows:

> Michael,
>
> Last week [the insurance broker] sent you information about Symetra's life insurance commitment to insure [Mr. Krivulka]. We want to make sure it holds water *given Joe has had a "change in condition*." This is time sensitive but *we want your opinion*.

(Emphasis added.)

87.     Thus, no later than September 12, 2016, Lerner knew that Mr. Krivulka had had a "change in condition" prior to issuance of the Policies.

88.     On September 21, 2016, the Policies were issued, one day after Lerner, as trustee of the Insurance Trust, had made the first modal premium payment to Symetra for the Policies. Lerner never disclosed to Symetra the change in Mr. Krivulka's condition prior to making the first modal premium payment.

89.     Between September 21, 2016 and February 2018, Lerner, as trustee of the Insurance Trust, made approximately $1.6 million in premium payments for the Policies despite knowing that: (i) Mr. Krivulka had been diagnosed with cancer prior to issuance of the Policies; and (2) the "change in condition" had not been disclosed to Symetra prior to his death.

90.     Relying on Lerner's "opinion" about whether the waiver "holds water," Mr. Krivulka ultimately gifted at least $1.6 million to the Trust that Lerner, as trustee of the Insurance Trust, used to pay the Policies' premiums.

**Symetra Seeks to Rescind the Policies**

91.     Subsequent to Mr. Krivulka's death in February 2018, a claim was made at Lerner's instruction on the Policies.  Mr. Krivulka's illness, and the timing of his diagnosis prior to issuance of the Policies, was not disclosed to Symetra until after his death, during the claims process.

92.     On August 2, 2018, Symetra filed a complaint against the Trust seeking to have the two Policies rescinded and declared void *ab initio*.  *See Symetra Life Ins. Co. v. JJK 2016 Ins. Trust*, Civil Action No. 18-12350 (MAS) (ZNQ) (D.N.J).  Symetra is seeking rescission on the grounds that Mr. Krivulka allegedly "made materially false" representations and statements in the application process about his medical condition.

93.     In March 2020, the Court granted Symetra's motion to add Lerner, as Trustee of the Insurance Trust, as an individual defendant, alleging, *inter alia*, that he committed insurance fraud in the procurement of the Policies under N.J.S.A. 17:33A-4(a) or (b).

94.     Because Symetra has refused to honor the Policies, it has returned the approximately $1.6 million in premiums to the Trust as property of the Trust.  If Lerner had properly advised Mr. Krivulka regarding the waiver, those funds would have been either property of the Estate or Mrs. Krivulka.

95.     Instead, Symetra has returned the funds to the Insurance Trust and, upon information and belief, they are being used to fund the Trusts' and Lerner's defense of Symetra's

rescission action.

**Lerner Fails to Follow Mr. Krivulka's Explicit Instructions, "Churns the File" as He is Dying and Then Claims to Have Run Out of Time to Implement Them**

**The December 19, 2017 Conference Call**

96.     By December 2017, Mr. Krivulka knew his condition was terminal and he needed to put in place a succession plan for running the Krivulka businesses.

97.     On December 19, 2017, he convened two separate conference calls. He made the first call to inform some high-level employees and Lerner that his illness was terminal. He, Mrs. Krivulka, her sons Alex Engelken and Derek Engelken, her brother-in-law and Krivulka Entity employee Sal Sinibaldi, a few other employees and Lerner participated in the first, relatively brief but emotional call.

98.     Mr. Krivulka conducted the second call to give instructions to Lerner about who he wanted to take over management of certain of the businesses from him (the "Succession Planning Call").  Mr. Krivulka, Mrs. Krivulka, Alex Engelken, Derek Engelken, Sal Sinibaldi and Lerner all participated in the Succession Planning Call.

99.     Mr. Krivulka informed the group that he wanted (i) Alex to become manager of Akrimax Pharmaceuticals LLC, Mist Pharmaceuticals LLC, Mist Acquisition LLC and Mist Partners LLC (the three Mist entities hereinafter collectively, the "Mist Entities"), (ii) Derek to become manager of Metuchen Therapeutics LLC ("Metuchen"), (iii) Mr. Sinibaldi to become manager of Rouses Point Pharmaceuticals LLC ("RPP"), and (iii) Mrs. Krivulka to become manager of Krivulka Family.  Before this call, Mrs. Krivulka had never heard of Krivulka Family and was not aware that she directly owned a percentage interest in it.

100.     During the call, Lerner seemed resistant to the idea of naming Mrs. Krivulka manager of Krivulka Family and questioned whether Mr. Krivulka meant to make her the

manager of KFE LLC, another Krivulka entity, instead.  Lerner tried to clarify which entity was

which by identifying the specific profit percentage interests of Mr. Krivulka, Mrs. Krivulka and

the trusts for each of his children in Krivulka Family, and the Krivulka entities in which Krivulka

Family had an interest. But Mr. Krivulka was adamant that he meant to make Mrs. Krivulka

manager of Krivulka Family, and directed Lerner to prepare the necessary paperwork for him to

sign to achieve the change to Mrs. Krivulka to succeed him as manager of Krivulka Family, and

the others discussed on the call.

101.    Mr. Krivulka was the sole manager of Akrimax, the Mist Entities (including Mist

Partners, of which Lerner's entity was and is a member), Metuchen (of which Lerner's entity

was a member), RPP Krivulka Family, and had the right, as the manager or of each entity, to

appoint his successor.

102.    Mr. Krivulka was the sole member of KFE LLC, which by that point in time, held

few, if any, assets of meaningful value in contrast to Krivulka Family LLC, which did.  Making

his wife manager of KFE LLC would have therefore amounted to nothing more than an empty

gesture.

103.    It took over a month for Lerner and Lowenstein to provide the necessary consents

for Mr. Krivulka to sign naming Alex manager of Akrimax and the Mist Entities.

104.    On February 9, 2018, seven weeks after the Succession Planning Call (and eight

days before Mr. Krivulka's death), Lerner and Lowenstein finally provided a consent for Mr.

Krivulka to sign naming Mrs. Krivulka manager.  However, instead of preparing a consent to

name her manager of Krivulka Family as Mr. Krivulka had instructed, Lerner provided a consent

for him to sign that named her manager of a separate entity, KFE, LLC, not Krivulka Family as

he had been explicitly instructed.

105.    By February 9th, Mr. Krivulka's condition had deteriorated to the point where he could no longer review or sign papers.  Instead, a stamp of his signature was used to endorse the consent that Lowenstein and Lerner erroneously prepared naming Mrs. Krivulka manager of KFE LLC, in direct contravention of Mr. Krivulka's explicit instructions.

106.    Lerner and Lowenstein never provided the consent needed to name Derek manager and put him in charge of Metuchen Therapeutics before Mr. Krivulka died, even though Lerner repeatedly contacted Mrs. Krivulka during Mr. Krivulka's last weeks to find out how much time he had left and make sure she obtained enough copies of Mr. Krivulka's death certificate to effect changes in management of other Krivulka Entities to the co-executors once he passed.

107.    On March 7, 2018, Mrs. Krivulka followed up with Lerner about the documentation Mr. Krivulka had instructed Lerner to prepare during the December 19, 2017 Succession Planning Call for Mr. Krivulka to execute appointing Derek manager of Metuchen. Lerner replied, "We ran out of time."

108.    A review of Lowenstein's invoices for work performed during January and February 2018 renders Lerner's claim that they "ran out of time" incredible.

109.    To the contrary, Lowenstein's invoices reveal an inordinate amount of time allegedly spent by four different associates reviewing operating agreements for the Krivulka Entities regarding transfer of management authority (without specifying which Entities in nearly all of the time entries), drafting and revising two and three page form consents to transfer management of the entities and updating summary spreadsheets. These efforts were certainly directed by Lerner and would have naturally informed Lerner of the necessary procedures to promptly implement Mr. Krivulka's instructions.  The only plausible explanation is that Lerner

deliberately slow-played the transfers of control to "run out the clock" to take advantage of Mr. Krivulka's rapidly deteriorating condition.

110.    The four associates' billed time for researching and preparing the documentation necessary to implement Mr. Krivilka's instructions for the transfer in management make up at least 61 separate time entries for a total amount of **264.4** hours over a seven-week time frame for a total of **$117,585** in fees billed.  Given these facts, the "ran out of time" excuse for failing to implement Mr. Krivulka's instructions is implausible.

111.    The most senior associate billing for the work, a fourth-year associate, billed **107.5 hours** for a total of **$54,825** for the following tasks:

- Reviewing LLC Agreements re: transfer requirements; updating summary spreadsheet – **11.6 hours**;

- Draft consents and amendments requirement for management transfers . . . or continue drafting consents and amendments required for management transfers – **22.6 hours**; and

- Confer with working group re: LLC Agreement review; continue drafting consents to transfer management rights – **13.5 hours**; and

- Various combinations of the above-described categories – **59.9** hours.

112.    The other three associates were all first-year associates.  The first one billed **92.1** hours for a total of **$36,840** for the following tasks:

- Review operating agreements of J. Krivulka entities re: requirements to transfer management authority; confer with [fourth year associate] re: same – **25.2 hours**;

- Prepare written consents re: transfer of management positions in J. Krivulka entities; confer with [fourth and first-year associates] re: same – approximately – **20.9 hours**;

- Review operating agreements of J. Krivulka entities and prepare written consents re: transfer of management positions" – **46 hours**.

113.    The second first-year associate billed **59.3 hours** for a total of **$23,720** for the

following three tasks:

- Conducting due diligence re: operating and LLC agreements of Krivulka entities – **16.9 hours**;

- Draft consents re: Krivulka entities; telephone call with [fourth and first-year associates] pertaining to consents – **19.7 hours**; and

- Various combinations of these tasks – **22.7 hours**.

114.    The third first-year associate had one-time entry for **5.5 hours** conducting due diligence re: LLC operating agreements for a total billed amount of **$2,200**.

115.    In contrast to his team of associates, Lerner billed **5.6 hours** between January 2, 2017 and Mr. Krivulka's death in February 2018 to effecting management changes in the Krivulka entities and conferring with the fourth-year associate for a total of **$5,376**.  The billing records demonstrate Lerner's deliberate and willful neglect of Mr. Krivulka's explicit and firm instructions. In effect, the Krivulkas' were billed over $118,000 for Lowenstein's failure to implement Mr. Krivulka's instructions. It is clear that Lerner dragged his feet to avoid implementing Mr. Krivulka's requested management changes, to Lerner's direct benefit. By avoiding Mr. Krivulka's unequivocal instructions, Lerner was able to succeed to multiple management positions he would not otherwise have.

116.    Following Mr. Krivulka's death, Lowenstein billed hundreds of more hours, and six figures more in legal fees to the Estate concerning the Krivulka Entities' governance matters, reviews of operating agreements concerning change in management positions or managers, appointment of a successor member, review of operating agreements concerning authority to appoint company management.  Many of the hours billed in March and April 2018 for reviewing operating agreements and transfer of management of the Krivulka Entities were billed by the same four associates who did the review in January and February but managed to only get a few

of the consents Mr. Krivulka wanted to sign prior to his death executed.

**Mr. Krivulka's Death**

117.    Mr. Krivulka died on February 17, 2018 in the Krivulkas' home in Scottsdale, Arizona.  Mrs. Krivulka, who remained by his side throughout his grueling illness, was devastated, distraught and physically and emotionally exhausted.  She was his primary caretaker throughout his illness to the very end.

118.    The morning after Mr. Krivulka died, Mrs. Krivulka called Lerner to inform him of his death.  During the call, and without explaining why or the legal implications of doing so, he instructed her to make sure the address of the Krivulkas' house in Holmdel, New Jersey was identified as the usual residence on his death certificate, even though he knew the Krivulkas had long before made their Arizona home their permanent home and domicile.

119.    Per Lerner's instructions, Mr. Krivulka's death certificate, dated February 20, 2018, listed the Holmdel, New Jersey address "decedent's usual residence address." Unbeknownst at the time to Mrs. Krivulka, placing New Jersey as Mr. Krivulka's usual residence on his death certificate gave Lerner and Lowenstein a basis for justifying filing the probate proceedings in New Jersey, where Lerner and Lowenstein would have more control.

120.    As discussed below, this deceit is especially improper given that neither Lowenstein nor Lerner ever advised her that a probate proceeding in Arizona was an option that she had every right to explore with independent counsel before hiring Lowenstein to represent her as co-executor, or consenting to Lowenstein representing Lerner as co-executor.

**Lerner and Lowenstein Solicit Mrs. Krivulka to Serve as her Counsel Despite Actual Conflicts and Without Informed Consent**

121.    Between February 18, 2018 and March 8, 2018, Lowenstein billed 44.8 hours preparing for estate administration meetings, comprehensive reviews of estate planning

28

documents, preparing a Visio presentation to present to Mrs. Krivulka to pitch her to engage the firm, researching Delaware law concerning the transfer of a single member's interests in limited liability companies upon the member's death; working on probate matters, drafting amendments to limited liability company agreements, creating forms for remaining amendments; reviewing operating agreements and preparing probate applications for submission to the probate court.

122.    At that point in time, Lowenstein and Lerner had been Mrs. Krivulka's long-standing counsel in her individual capacity, but had not been engaged in any respect as counsel for the Estate or, to her knowledge, either of its co-executors.

123.    During this period, no one discussed with her the prospect of Lowenstein representing her as a co-executor or the Estate in any capacity, or Mr. Lerner for that matter.  In fact, Lowenstein's bills show no billed time for any discussions with Mrs. Krivulka about anything having to do with the administration of the Estate during this period.

124.    The only discussions Lerner did have with Mrs. Krivulka during the period just after her husband's death were apparently "off the clock," during which he told her not to worry about the Estate, which he would take the laboring oar in administering, and advised her to go to the mall and shop, go on vacations, and continue to live life as she had before her husband's death.

125.    On March 8, 2018, just three weeks after Mr. Krivulka died, Lerner contacted Mrs. Krivulka indicating that "John Berger and I were thinking of coming out to Scottsdale on March 20-21 to meet with you to discuss the Will and the process."  Based on this, Mrs. Krivulka believed that they wanted a meeting with her to discuss the substance of the Will and the probate process.

126.    As it turns out, the real goal of the meeting was to get Mrs. Krivulka to engage Lowenstein as her counsel in her role as co-executor, and to consent to Lerner engaging Lowenstein as his counsel as co-executor.

127.    As Lowenstein's bills confirm, no one billed time for communications with Mrs. Krivulka concerning Estate administration matters or even submitting probate applications between March 8 and March 20, 2018.

128.    Yet on or about March 14, 2018, Lowenstein had started the probate process by submitting the original Will and codicil to the court. Court records reflect Letters Testamentary for both Mrs. Krivulka and Lerner were pending as of March 14, 2018 as well, despite the lack of any communication with Mrs. Krivulka during this period.

129.    On March 16, 2018, Lerner executed before a notary public an "Application Probate" with Docket No. 252593 for "Applicant(s) Angela L. Krivulka, residing at 3 Bucks Mill Lane, Holmdel Township, NJ 07733 and Michael J. Lerner …."

130.    The application further recited that "Decedent died resident of 3 Bucks Mill Lane, Holmdel Township, in the County of Monmouth and State of New Jersey on February 17, 2018…."

131.    By all relevant criteria under both New Jersey and Arizona law, Mr. Krivulka was neither a resident nor domiciliary of New Jersey as of the date of his death, and Lowenstein knew it. Nor was Mrs. Krivulka a resident or domiciliary of New Jersey at this time.

132.    The probate application concluded with "the applicant(s) request[ing] judgment: 1. Admitting the law Will and/or Codicil(s) to Probate 2. Directing that Letters Testamentary be granted to applicant(s)."

133.    On or about March 20, 2018, Lerner and Berger flew to Arizona and met with Mrs. Krivulka at the Krivulka Entities' offices in Scottsdale, ostensibly to discuss the Will and the probate process.

134.    During the meeting, Lerner and Berger told her that she had about $10,000,000 coming to her from Krivulka Family because distributions had been made to the other members since 2015, but not her. This was the first Mrs. Krivulka had heard this. With this substantial sum coming to her, Lerner repeated at this meeting that she should leave things to them (Lerner and Lowenstein) and shop, vacation and enjoy life as she had before Mr. Krivulka's illness.

135.    Although they did not discuss it with her in advance of the meeting, they came prepared with two documents for her to sign.

136.    The first was a fully drafted engagement letter on Lowenstein letterhead.  The engagement letter indicated that "we are honored that you have asked us to serve you connection with the administrations of Joe's estate (the "Estate")[]" and also provided that Lerner would be engaging Lowenstein as his counsel as well.  Mrs. Krivulka had not asked Lowenstein to represent her in her role as co-executor of the Estate prior to or during the meeting.  They presented the engagement letter to her for signature during the Arizona meeting as a *fait accompli*.

137.    The engagement letter provided that Lowenstein would jointly represent Lerner and her as co-executors of Mr. Krivulka's Estate, but there was no discussion during the meeting about any issues or conflicts that existed at the time or that might arise from Lowenstein's joint representation of both of them, or, for that matter, any of the substance of the engagement letter.

138.    While the engagement letter does make a passing reference to the firm being able to jointly represent Lerner and Mrs. Krivulka "[b]ased on facts currently known to" them,

31

Lowenstein knew or should have known that was untrue.

139.    When they traveled to Arizona to solicit Mrs. Krivulka as a client, Lowenstein and Lerner did not disclose that Mr. Krivulka had sought and obtained advice in March 2016 from them about the Krivulkas' "changing domicile" to a community property state that also had significant implications for her own estate plan.  Among other things, they failed to advise her directly in 2016 that she should consider a change to her own estate plan because of their move or seek independent counsel on any related issues, including whether she had a personal right to much of the assets subsequently treated as part of the Estate as community property, rather than subjecting all of it to probate.

140.    Had they done so, and advised her that she had the right to confer with independent counsel, both Lowenstein and Lerner risked losing an engagement that has since earned the firm and Lerner approximately $3,600,000 in attorneys' fees and statutory commissions combined to date, or for Lerner, a reduction in the substantial commissions he has earned and stands to earn over the lifetimes of Mrs. Krivulka and the Krivulkas' children.

141.    Nor did they discuss with her, as disinterested fiduciaries should have, whether Mr. Krivulka's Will should be probated in Arizona versus New Jersey given that the Krivulkas had made Arizona their permanent home and domicile years before, and Arizona was where their permanent home was located, where the majority of their automobiles were registered, where they established personal bank and investment accounts, where their aircraft was hangered and where they lived full-time.

142.    Instead, Lerner and Lowenstein came prepared with a verbatim copy of the same "Application Probate" Lerner had already signed on March 16 for Mrs. Krivulka to sign.  They told her to sign it without explaining the substance of the application with Mrs. Krivulka at the

meeting, the significance of listing Mr. Krivulka's residence as Holmdel Township, NJ (or hers for that matter) or asking her if it was correct in light of the legal significance of the so-called "facts" recited in it.

143.    If Mr. Krivulka's Will had been probated in Arizona, Lowenstein would not have been able to serve as counsel to either of the co-executors (and lost millions of dollars in legal fees over the next few years), and Mrs. Krivulka would have made her claim to more than half of the Estate's assets as community property.  That would also have significantly reduced the size of the Krivulkas' wealth that Lerner would manage and control, as co-executor and trustee, and commissions he would earn.

144.    Lowenstein and Lerner knew at the time of the Arizona meeting with Mrs. Krivulka that they were both conflicted with him and Lowenstein serving as deal counsel to Krivulka Entities in which he had (and still has) an ownership interest. At the same time, Lerner was about to be appointed co-executor, Lowenstein was soliciting Mrs. Krivulka to serve as counsel as co-executor and Lerner was (and still is) a partner in Lowenstein.

145.    Prior to her executing the engagement letter, neither Berger nor Lerner made any disclosures to her, orally or in writing, about any conflicts of interest that Lerner or Lowenstein actually had or potentially would have in serving simultaneously as counsel to Joe's businesses, co-executor of the Estate with beneficiaries (including Mrs. Krivulka) with potentially conflicting interests, partner in several of Mr. Krivulka's businesses, or trustee of various trusts with beneficiaries with actually or potentially conflicting interests.  Nor did they discuss with her any potential conflicts Lowenstein actually or potentially might have serving as both of their counsel.  Lowenstein never obtained informed written consent from Mrs. Krivulka to the joint representation.

146.    Lowenstein and Lerner had an obligation to advise her to seek independent counsel about whether to engage Lowenstein or separate, independent counsel, who surely would have considered whether Arizona was a more appropriate forum to probate Mr. Krivulka's Will.

147.    They also failed to advise her that there were different pathways that could be pursued with respect to probating the Estate.  Incredibly, no one raised the pluses or minuses regarding probating the Will in Arizona versus New Jersey that a fiduciary might want to consider.

148.    Instead, much of their meeting was spent with Lerner and Berger making phone calls to change flight arrangements to return to New Jersey the same day in light of an impending winter storm on the East Coast.

149.    Believing, at the time, that because Lerner and Lowenstein had long been counsel to her and her husband, and were therefore looking out for her and the Estate's best interests, she signed the engagement letter before they left the meeting to return home.

150.    On March 26, 2018, Letters Testamentary were issued to Mrs. Krivulka and Lerner by the New Jersey Surrogate's Court authorizing them to administer the Estate as its co-executors.

**Contrary to Mr. Krivulka's Last Wishes, Lerner is a Co-Manager of Krivulka Family**

151.    Because Lerner and Lowenstein failed to follow Mr. Krivulka's explicit instructions to prepare the necessary consents to appoint Mrs. Krivulka manager of Krivulka Family, and Mrs. Krivulka did not learn of Lerner and Lowenstein's error until after Mr.

Krivulka's death, the role of manager of Krivulka Family defaulted to the Estate's co-executors, Mrs. Krivulka *and* Lerner.

152.    After having his firm incur over 200 hours reviewing operating agreements in January and February 2018, making lists, spreadsheets and schedules for changes of management of the Krivulka Entities and drafting unspecified consents to effect such changes, Lerner's decision to prepare the consent designating Mrs. Krivulka manager of the wrong entity and delaying its execution weeks and weeks until just days before Mr. Krivulka's death was no accident.  This maneuver was designed to give him control and, in particular, a blocking position over Krivulka Family, which has substantial assets, and left Mrs. Krivulka the sole manager of KFE LLC, which has no significant assets, but not Krivulka Family as Mr. Krivulka specifically instructed.

153.    Lerner's failure to follow Mr. Krivulka's express direction in a timely fashion— particularly egregious since Lerner knew by December 19, 2017 that he did not have much time left—allowed Lerner to wrestle control over Krivulka Family and its assets when he otherwise would not have had any.  Mrs. Krivulka was designated the sole manager of Krivulka Family by her husband, and should have the final say about the LLC's management.

154.    Instead, she now must co-manage the entity with Lerner in a blocking position, which he is using to take unreasonable positions vis-à-vis Mrs. Krivulka's interest in the entity and the millions of dollars of overdue distributions he and Lowenstein had told her at the March 20, 2018 meeting in Arizona should have been made to her since 2015.

155.    Since 2015, tens of millions of dollars had been distributed from Krivulka Family, but, as reflected on the company's books and records, nothing has been distributed to Mrs. Krivulka.  Mrs. Krivulka learned of these distributions and the fact that Lowenstein prepared a

consent naming her manager for the wrong entity (KFE LLC) instead of Krivulka Family only after Mr. Krivulka's death.

156.    Lowenstein and Lerner went to the March 20 meeting with a duty to her as an existing client of the firm to be candid and, with a duty of candor as they were trying to pitch to hire the firm in her representative capacity.  They breached both of those duties with significant consequences.

157.    Since then, Lowenstein and Lerner have claimed they have a reasonable dispute as to whether Mrs. Krivulka is entitled to the funds, preventing them from distributing any to her. They contend that she should be deemed to have received at least some of the distributions Krivulka Family's records reflect were made to Mr. Krivulka—not her—because they were deposited in their joint bank account.  Whether Mr. Krivulka deposited *his* distributions from Krivulka family in a bank account held jointly by the Krivulkas is irrelevant to whether Mrs. Krivulka received distributions to which she was separately and personally entitled as a member of Krivulka Family.

### **Lerner Advises Mrs. Krivulka to Use His Personal Accountant to Estimate Taxes**

158.    Lerner and Lowenstein have also taken the position that distributions made to Mr. Krivulka may have been used to pay income taxes on Mrs. Krivulka's behalf.  This position is in conflict with advice they gave to Mrs. Krivulka about tax payments weeks before the April 2018 tax deadline concerning, among other things, Krivulka Family.

159.    In late March 2018, Lowenstein and Lerner pressed Mrs. Krivulka about whether she should file a joint tax return with Mr. Krivulka for the 2017 tax year, and the need to make at least an estimated tax payment for the 2017 tax year (for which returns had not yet been filed or, apparently, estimated taxes had not been paid) by the April 2018 tax deadline.

160.    Prior to his death, Mr. Krivulka and his accountants took responsibility for the couple's joint tax filings.  Mrs. Krivulka had no separate or independent tax advisors from Mr. Krivulka's at that time and found herself up against an April 2018 deadline to pay taxes without someone to help her navigate her very recent change in circumstances.

161.    Lerner advised her to use his personal accountant, Stanley Gulkin, to calculate her estimated taxes owed for 2017, a year in which millions of dollars in distributions were made to all the members of Krivulka Family except Mrs. Krivulka.

162.    The estimated taxes for 2017 were based on, among other things, Mrs. Krivulka's pro rata portion of Krivulka Family income.  Although the other members of Krivulka Family received distributions during 2016 and 2017 that could be used to cover tax payments, Mrs. Krivulka did not.

163.    With the tax deadline fast approaching, Lerner told her that he had and was using Mr. Gulkin to prepare the tax returns for the Krivulka children's GST trusts, the other members of Krivulka Family, and suggested that Mr. Gulkin already had the information that would be necessary to estimate her share of taxes on Krivulka Family income for 2017.

164.    What Lerner did not tell Mrs. Krivulka (or presumably Mr. Krivulka's children, the beneficiaries of the trust for which he serves as trustee) was that Mr. Gulkin had previously been disbarred and stripped of his accountancy licenses in New Jersey and New York because he had pled guilty to conspiracy and theft by deception. Mr. Gulkin had apparently arranged approximately $4,000,000 in bogus insurance premium financing loans that resulted in losses to the banks which financed the loans and to investors of an organization he operated.  He served ten months of a five-year prison sentence.  His accountancy license was subsequently reinstated in New Jersey, although he remains disbarred in both New Jersey and New York.

165.    Mr. Gulkin (and his wife) were also sued by the Securities and Exchange Commission for "illegal insider trading," and entered into a consent judgment agreeing to liability for disgorgement of all profits to them as a result of the conduct alleged in the complaint.  Lerner neglected to tell Mrs. Krivulka about that, too.

166.    Lerner and Lowenstein also failed to inform Mrs. Krivulka that Section 5.01 of the governing operating agreement for Krivulka Family specifically mandates that "…the Company shall distribute in cash no less than the 'Tax Distribution Amount' (as defined in Section 5.03)."

167.    Despite advising her to make sure she made tax payments on phantom income from Krivulka Family, to date, Lerner and Lowenstein have refused, despite multiple requests, to make any distributions to Mrs. Krivulka from Krivulka Family, including any Tax Distribution Amounts.  Instead, Mrs. Krivulka used hundreds of thousands of dollars of personal funds to pay her estimated taxes for 2017 stemming from phantom income from Krivulka Family, and has never received the Tax Distribution Amount from Krivulka Family for that tax year, or any other.

168.    Of course, Lerner would not be in a position to block distributions owed to Mrs. Krivulka had he followed Mr. Krivulka's instructions and prepared the consents for Krivulka Family instead of KFE LLC.

169.    Lerner, as trustee of the GST Trusts for Mr. Krivulka's children, has an economic and control interest in Krivulka Family.  The dispute between Mrs. Krivulka and Lerner about distributions from Krivulka Family to her has a direct impact on distributions made to the children's trusts.  The greater the distributions to the trusts (and less to Mrs. Krivulka), the greater the statutory commissions he earns as trustee.

**Lowenstein and Lerner Breached Their Duties of Care and Fiduciary Duties to Mrs. Krivulka, Causing Her Substantial Harm**

170.    Lowenstein had a duty – which it breached – to communicate directly with Mrs. Krivulka in 2016, both before and after her husband's diagnosis, about the community property issues Lowenstein had outlined seemingly for both of the Krivulkas in the Memorandum but only sent to Mr. Krivulka.

171.    The failure to communicate with Mrs. Krivulka directly about the Memorandum and advise her that she should consult with independent counsel was compounded later in 2016 when Mr. Krivulka's diagnosis was confirmed and Lowenstein made changes to his estate planning instruments without taking the community property issue into account.

172.    At a minimum, Lowenstein should have discussed the community property issues identified in the Memorandum directly with Mrs. Krivulka (especially in light of the potential for conflicts arising from the implications of living in a community property state).  They should also have advised her that she had the right to consult with independent counsel, not just with respect to her own estate plan, but with respect to the community property stake she might have in her husband's assets.

173.    Lerner's and Lowenstein's lack of candor after Mr. Krivulka's death, including Lerner's actions which could only have been intended to attempt to bolster a basis for having the Will probated in New Jersey instead of Arizona, when both Lerner and Lowenstein knew he had changed domicile to Arizona years earlier are actionable.

174.    Lerner and Lowenstein also had a duty to disclose all actual and potential conflicts of interest they were aware of prior to asking Mrs. Krivulka to engage Lowenstein as her counsel but they did not.  In fact, just a few months later, Lowenstein admitted both Lerner

and Lowenstein had at least one conflict due to the many hats Lerner was wearing by then, including:

(i)      Attorney and friend of Mr. Krivulka;

(ii)     Attorney and friend of Mrs. Krivulka;

(iii)    Attorney for the Krivulka Entities, including the Mist Entities;

(iv)     Partner in the Mist Entities (either directly or indirectly through JAM Investment Partners, LLC);

(v)      Co-executor of the Estate;

(vi)     Partner in Lowenstein;

(vii)    Co-trustee of the marital trust (with obligations to both Mrs. Krivulka as beneficiary during her lifetime and Mr. Krivulka's children as beneficiaries of any residue of the marital trust); and

(viii)   Trustee of various trusts benefitting Mr. Krivulka's children;

(ix)     Individual defendant in sprawling five year litigation for his alleged role in orchestrating a scheme to divert assets from one Krivulka Entity (for which Lerner and Lowenstein were counsel) to the Mist Entities (in which he is a partner through JAM Investment Partners, LLC and for which he and Lowenstein were also counsel); and

(x)      Individual defendant accused of insurance fraud in his capacity as trustee of the Insurance Trust in the *Symetra* litigation in which he advised Mr. Krivulka not to disclose his illness to the carrier prior to Lerner cutting the first modal premium so the $25,000,000 in Policies would issue.

175.    Lerner and Lowenstein had a duty to disclose the significance of listing the Holmdel Township, New Jersey address on the death certificate but did not. Lowenstein and Lerner also had a duty to make sure Mrs. Krivulka understood when she engaged the firm to serve as her counsel as co-executor all facts known to them about even the potential for conflict, and to disclose them in writing.  They did not.

176.    When she was presented with the probate application at the March 20th meeting that was prepared at Lowenstein and Lerner's instance, Lowenstein and Lerner again had a duty to explain to her the significance of listing the Holmdel Township, New Jersey address for both her and her husband and the options available to her to probate the Will, but they did not.  They also had a duty to advise her to seek independent counsel in connection with whether she should engage Lowenstein, consent to Lowenstein representing Lerner and the proper jurisdiction for submitting the Will for probate. But, again, they did not.

177.    As a direct and proximate result of Lerner's and Lowenstein's acts, omissions and undisclosed conflicts of interest to Mrs. Krivulka, both prior to and after Mr. Krivulka's death, she has sustained substantial damages.

178.    By way of example, a substantial portion of the value of the assets subsequently administered as if part of the Estate are Mrs. Krivulka's share of community property and should not be included in the Estate nor administered as part of the Estate. Instead, as structured by Lowenstein for its benefit and the benefit of Lerner, about half of the artificially-created net value of the Estate is supposed to fund the Marital Trust, of which Lerner is co-trustee and has the power under the Will to police and limit distributions to Mrs. Krivulka that he otherwise would not have, and she would have had the ability to invest and utilize freely (as her own property outside the Estate) since February 2018.  Instead, the substantial sum that should have been released to her as her own property remains under the effective control of Lerner presumably to eventually fund the Marital Trust.

179.    Lerner's motivation was clear.  Since becoming the Estate's co-executor in March 2018, Lerner has taken home at least $4.3 million in proceeds from the sale of the Krivulka Entities' assets and executor commissions.  That hefty amount does not include whatever piece

he has taken of Lowenstein's $2.5 million in fees collected for the firm's administration of the Estate or commissions for serving as a trustee of multiple trusts.

**Lowenstein and Lerner Owed Duties of Care and Fiduciary Duties to Mr. Krivulka Which They Breached, Causing Substantial Harm to the Estate**

180.    Lerner and Lowenstein owed Mr. Krivulka a fiduciary duty of loyalty candor and due care as his counsel to follow his instructions in a timely fashion.

181.    Lerner and Lowenstein failed to provide proper advice and make adequate disclosures in accordance with the requisite standard of care to Mr. Krivulka in connection with his estate plan in 2009 (including building structure for his estate plan with inherently conflicting interest with Lerner as his co-executor, co-trustee of the marital trust, co-trustee of the children's trusts, including a limitation on Lerner's liability in a will drafted by Lowenstein without making the requisite disclosures), the implications of having moved to a community property state by at least 2009 (both from a tax and estate planning perspective) and with respect to whether his illness should have been disclosed to Symetra prior to the issuance of the Policies.

182.    Prior to his death, Mr. Krivulka also gave Lerner and Lowenstein explicit instructions that Mrs. Krivulka should succeed him as manager of Krivulka Family, Derek should succeed him as manager of Metuchen and Sal Sinibaldi should succeed him as sole manager of RPP, which they did not follow.

183.    Despite having his associates bill over 260 hours in the six-week period after the Succession Planning Call, ostensibly to prepare two or three page consents to transfer management of unspecified Krivulka Entities, Lerner and Lowenstein waited until days before Mr. Krivulka's death to provide consents naming Mrs. Krivulka as his successor manager but for the wrong entity, KFE, LLC.  Lerner and Lowenstein also failed to prepare the necessary

paperwork to have Derek and Sal Sinibaldi succeed him as manager in accordance with his express wishes.

184.    Lerner and Lowenstein also owed Mr. Krivulka a fiduciary duty with respect billing reasonable amounts for the work performed and not to overbill him for work performed.

185.    By way of example only, Lowenstein billed Mr. Krivulka over $118,000 in connection with the transfer of management of the Krivulka Entities in January 2018, knowing he would never be in a position to review the bills and failing to yield meaningful work commensurate with the time billed during that period.  Lerner and Lowenstein breached that duty by churning its fees.

## FIRST CLAIM FOR RELIEF

(Legal Malpractice, on behalf of Mrs. Krivulka, individually)

186.    Mrs. Krivulka repeats and realleges the allegations contained in all of the proceeding paragraphs as if fully set forth herein.

187.    In providing the advice and legal services outlined above, defendants were required to adhere to the applicable standard of care relating to the advice and professional services they provided to and for the benefit of Mrs. Krivulka.

188.    The standard of care and duty of loyalty inherent in Lowenstein's and Lerner's roles as counsel to Mrs. Kriuvlka required providing accurate, complete estate planning and other legal advice free of conflicting interests between Mr. and Mrs. Krivulka, as well as among Lowenstein, Lerner and the Krivulkas.  It also required that Lowenstein and Lerner fully and directly apprise Mrs. Krivulka of all conflicts (potential and actual) in 2016, as well as the consequences implicated in the Memorandum, where the probate proceeding could have been instituted, advising her to seek independent counsel with respect to such advice in March 2016,

in Mr. Krivulka's final days when they used Mrs. Krivulka's trust to solidify their eventual positions, and again in March 2018 when they traveled to Arizona to solicit her to hire Lowenstein, before implementing their advice.

189.    Lowenstein and Lerner breached the applicable standard of care by failing to candidly disclose all potential and actual conflicts of interest, providing negligent advice, negligently failing to fully investigate the facts underlying its advice and by negligently undertaking legal services to implement its advice.  In particular, defendants used Mrs. Krivulka's trust in them for their own personal interest and to solidify their positions, and failed to understand and to advise Mrs. Krivulka concerning substantial adverse estate and tax consequences that would result, and have resulted, from the dispensing and implementation of its advice.

190.    As a direct and proximate result of defendants' professional malpractice and negligence, Mrs. Krivulka have suffered and continue to suffer damages, as described above, and seeks all additional available relief including an award of attorneys' fees and costs in connection with this action and disgorgement of attorneys' fees and costs paid to Lowenstein for the services underlying this claim.

## SECOND CLAIM FOR RELIEF

(Breach of Fiduciary Duty, on behalf of Mrs. Krivulka, individually)

191.    Mrs. Krivulka repeats and realleges the allegations contained in all of the preceding paragraphs as if fully set forth herein.

192.    Defendants, as attorneys rendering legal services to Mrs. Krivulka, owed her a fiduciary duty of care and loyalty. This duty included providing non-negligent advice to plaintiffs free of personal interest that adhered to the applicable standard of care.

44

193.    As alleged above, Lowenstein and Lerner intentionally profited via non-disclosure and/or bad advice when they failed to communicate directly with Mrs. Krivulka regarding the Memorandum, failed to advise her to seek independent counsel with respect to the issues raised in the Memorandum, failed to protect her interests as Mr. Krivulka was making final arrangements for his passing, failed to alert her that the KFE entity was not the one Mr. Krivulka had intended her to manage, and failed to make disclosures about actual and potential conflicts of interest following Mr. Krivulka's death. Lerner's instructions to Mrs. Krivulka to place New Jersey as Mr. Krivulka's usual residence, and Lerner and Lowenstein's solicitation of Mrs. Krivulka to have Lowenstein serve as counsel for both Co-Executors to ensure Lowenstein obtained a plum piece of business and fees and commissions for Lerner were simply, as both Lerner and Lowenstein knew, wrong.

194.    Defendants breached their fiduciary duty to Mrs. Krivulka as described above, resulting in the proximately caused damages described above. Additionally, Mrs. Krivulka seeks disgorgement of attorneys' fees and costs paid to Lowenstein for the services underlying this claim.

195.    Additional circumstances exist in this case, beyond those alleged concerning legal malpractice, that support a claim for breach of fiduciary duty. These circumstances include: Lerner's position as her "attorney and friend" and  Lowenstein's dispensation of estate planning advice, including the installation of Lerner in the multiple positions to act as the family's executor, manager and trustee, relates to the most personal and intimate of financial matters within a family, and their direct interaction with multiple family members as described above, creates a special fiduciary obligation to the Mrs. Krivulka above and beyond those owed in other

attorney-client relationships. This particularized fiduciary duty was breached in this case, in the manner described above.

196.    The circumstances described above underscore the need for Lerner and Lowenstein to be above reproach in their various roles at all times, and either free of all conflict or at least armed with well documented informed consents.  Lowenstein and Lerner, in their respective roles as counsel and co-executor to Mrs. Krivulka, owed a duty of loyalty that required them to put their clients' interest ahead of their own and to disclose any actual or potential conflicts of interest to the Krivulkas in writing, as well as to advise them to seek independent counsel when such actual or potential conflicts arose.  They simply did not do so.

## THIRD CLAIM FOR RELIEF

(Legal Malpractice, on behalf of Mrs. Krivulka, as Co-Executor)

197.    Mrs. Krivulka repeats and realleges the allegations contained in all of the proceeding paragraphs as if fully set forth herein.

198.    Lowenstein and Lerner had a duty of care to follow Mr. Krivulka's explicit instructions to prepare the proper paperwork to appoint Mrs. Krivulka manager of Krivulka Family before he died, and breached that duty when they prepared the wrong paperwork.

199.    Lowenstein and Lerner were his lawyers (in his individual capacity as control person with the right to make sure appointments).  As a co-executor of the Estate, Mrs. Krivulka has the right to bring claims on behalf of the Estate which belonged to her husband.

200.    Lerner and Lowenstein failed to make adequate disclosures to Mr. Krivulka about the inherently conflicting structure Lowenstein built into his estate plan. In particular, they did not disclose the conflicts created by and consequences resulting from having Lerner

46

simultaneously serve as co-executor, co-trustee of the marital trust, co-trustee of the various Krivulka and Engelken children's trusts, partner in the Mist Entities and partner in Lowenstein.

201.    Lowenstein's and Lerner's failure to implement in a timely fashion, given his imminent death, Mr. Krivulka's instructions to prepare the necessary paperwork to have Mrs. Krivulka succeed him as Krivulka Family's manager prior to his death, breached their duty of care.  Instead, they prepared paperwork having Mrs. Krivulka succeed Mr. Krivulka as manager of KFE, LLC, the wrong entity.  At a minimum, Lerner's and Lowenstein's failure to prepare the right paperwork breached their duty of care to him, and placed Lerner in a position of control with respect to Krivulka Family contrary to Mr. Krivulka's express wishes.

202.    Additionally, Lerner and Lowenstein breached the duty of care with respect to Lerner's advice to Mr. Krivulka concerning the disclosure of his "change of condition" prior to the issuance of the Policies.

203.    As a direct and proximate result of Lerner's advice, Mr. Krivulka paid approximately $1.6 million in premiums that he otherwise would not have, and those funds have been returned to the Insurance Trust, outside the reach of the Estate, as a result of the *Symetra* litigation.  Instead, those funds are likely being used to fund the defense of the *Symetra* litigation, including Lerner's now that he is an individual defendant in that action.

204.    In providing the advice and legal services outlined above, defendants were required to adhere to the applicable standard of care relating to the advice and professional services they provided to and for the benefit of Mr. Krivulka and ultimately his Estate and its beneficiaries.  The standard of care and duty of loyalty inherent in Lowenstein's and Lerner's roles as counsel to Mr. Krivulka required providing accurate, complete estate planning and other legal advice free of conflicting interests between the Krivulkas, as well as among Lowenstein,

Lerner, Mrs. Krivulka and Mr. Krivulka.  It also required that Lowenstein and Lerner fully

apprise Mr. Krivula of all consequences before implementing their advice, as well as advising

Mr. Krivulka to seek independent counsel with respect to such advice.

205.    Lowenstein and Lerner breached the applicable standard of care by providing

negligent advice, negligently failing to fully investigate the facts underlying its advice and by

negligently undertaking legal services to implement its advice.  Among other things, defendants

failed to understand and to advise Mr. Krivulka concerning substantial adverse estate tax and

income consequences that would result, and have resulted, from the dispensing and

implementation of its advice and the fees and expenses that would accumulate for defendants'

benefits and to the detriment of Mr. Krivulka and his estate as a result of the inherent conflicts in

Lerner's multiple roles.

206.    As a direct and proximate result of defendants' professional malpractice and

negligence, the Estate has suffered and continue to suffer damages, as described above, and

seeks all additional available relief including an award of attorneys' fees and costs in connection

with this action and disgorgement of attorneys' fees and costs paid to Lowenstein for the services

underlying this claim.

### FOURTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty, on behalf of Mrs. Krivulka, as Co-Executor)

207.    Mrs. Krivulka repeats and realleges the allegations contained in all of the

preceding paragraphs as if fully set forth herein.

208.    Defendants, as attorneys rendering legal services to Mr. Krivulka, owed him a

fiduciary duty of care and loyalty. This duty included providing non-negligent advice to

plaintiffs that adhered to the applicable standard of care.

209.    Defendants breached their fiduciary duty to Mr. Krivulka as described above, resulting in the proximately caused damages described above. Additionally, Mrs. Krivulka, as co-executor and on behalf of the Estate, seeks disgorgement of attorneys' fees and costs paid to Lowenstein for the services underlying this claim.

210.    Additional circumstances exist in this case, beyond those alleged concerning legal malpractice, that support a claim for breach of fiduciary duty. These circumstances include: Lerner's position as his "attorney and friend" and attorney and friend to all of his immediate family and Lowenstein's dispensation of estate planning advice, which relates to the most personal and intimate of financial matters within a family, and their direct interaction with multiple family members as described above, creates a special fiduciary obligation to Mr. Krivulka above and beyond those owed in other attorney-client relationships. This particularized fiduciary duty was breached in this case, in the manner described above.

211.    Additionally, Lowenstein and Lerner owed a duty of loyalty that required them to put their client's interest ahead of their own and to disclose any actual or potential conflicts of interest to Mr. Krivulka in writing, as well as to advise them to seek independent counsel when such actual or potential conflicts arose.

## REQUEST FOR RELIEF

WHEREFORE, plaintiff Angela Krivulka, individually and as Co-Executor of the Estate, prays that judgment be entered in her favor, awarding damages sufficient to compensate her and the Estate for the damages they suffered as a result of defendants' wrongful and negligent conduct, including an amount sufficient to restore them to the condition they would have enjoyed but for defendants' wrongful conduct, including pre- and post-judgment interest, disgorgement

of fees paid to Lowenstein, an award of her attorneys' fees and expenses in this action, and such other and further relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all of the triable issues in this complaint.

Dated: New York, New York
July 31, 2020

**AMINI LLC**

*Attorneys for Plaintiff Angela Krivulka, individually and as Co-Executor of the Estate of Joseph Krivulka*

By: __*/s/ Lita Beth Wright*_____
Lita Beth Wright